CALEB & CO. and Unit & Co., partnerships, on behalf of themselves and all others similarly situated, Plaintiffs,

v.

E.I. DuPONT DE NEMOURS & COMPANY, First Jersey National Bank, and Conoco, Inc., Defendants.

No. 84 Civ. 4075(RWS).

United States District Court, S.D. New York.

Oct. 31, 1985.

Breed, Abbott & Morgan, New York City (Thomas A. Shaw, Jr., Thomas W. Kelly, Howard Wolfson, of counsel), for plaintiffs.

Cravath, Swaine & Moore, New York City (Ronald S. Rolfe, Alan R. Glickman, Marc J. Apfelbaum, of counsel), for E.I. DuPont and Conoco.

Olwine, Connelly, Chase, O'Donnell & Weyher, New York City (Job Taylor, III, William K. Dodds, Maura Fecher, of counsel), for First Jersey Nat. Bank.

### OPINION

SWEET, District Judge.

Plaintiffs Caleb & Company and Unit & Co. ("Caleb") have brought a motion for an

---

order pursuant to Rule 3(j) of the Civil Rules for the Southern District of New York granting reargument of that portion of the court's July 26, 1985 opinion which dismissed Caleb's second cause of action "to the extent that it is premised on an obligation to pay promptly prior to August 17."

■ The standard for granting a motion for reargument is strict in order to dissuade repetitive arguments on issues that have already been considered fully by the court. Such motions, therefore, may be granted only where the court has overlooked matters or controlling decisions which might have materially influenced the earlier decision. *New York Guardian Mortgagee Corp. v. Cleveland,* 473 F.Supp. 409, 420 (S.D.N.Y.1979). In its memorandum in support of the motion for reargument, Caleb cites no controlling authority which would controvert the court's earlier opinion but instead asserts that the court may have overlooked the terms of the prospectus on which Count Two of the complaint was premised.

■ In view of Caleb's motion for reargument, the relevant paragraph of the prospectus has been reexamined to determine whether any relevant matters had been overlooked in rendering the July 26 opinion. Since the July 26 opinion does not, either explicitly or implicitly, address the significance of the different language used in the summary of the prospectus, the body thereof, and the press releases, the motion for reargument is granted.

All of the evidence on the record including each of the memoranda submitted in support of the original motion have been reconsidered and upon such reconsideration the conclusion in the July 26, 615 F.Supp. 96, opinion which dismissed a portion of Count Two of Caleb's complaint is withdrawn and the motion to dismiss denied. It is assumed that all authorities and argument have been presented, and thus no reargument as such is required. However, should DuPont wish to be heard further, such reargument can be heard upon notice on November 8 or such other date as is agreeable to counsel and upon such notice this decision will be stayed until reargument.

The DuPont prospectus included an obligation to pay promptly in accordance with the following terms:

> Upon the terms and subject to the conditions of the Offer, the exchange of DuPont Shares or cash for Conoco Shares validly tendered and not withdrawn will be made as promptly as practicable after the latest of
>
> (i) the tender of such Conoco Shares,
>
> (ii) 12:00 Midnight, New York time, on August 4, 1981,
>
> (iii) approval of the DuPont stockholders of the proposal to amend the certificate of Incorporation of DuPont to increase the authorized number of DuPont Shares and to approve the issuance of DuPont Shares in connection with the acquisition of Conoco, at a meeting called for August 17, 1981,
>
> (iv) the expiration of the waiting period applicable to the Offer under the HSR Act in connection with the Purchaser's acquisition of the Conoco Shares or
>
> (v) with respect to any Conoco Shares not theretofore accepted for exchange, the expiration of any withdrawal period resulting from the commencement of a tender offer for Conoco Shares by another bidder.
>
> *Notwithstanding clause (iii) above, the Purchaser reserves the right (but shall not be obligated) to accept Conoco Shares in exchange for cash prior to DuPont stockholder approval.*

Prospectus at 17–18 (emphasis added). The July 26 opinion analyzed each of these two sentences and found what appeared to be an unambiguous obligation followed by an additional reserved right. Thus, the opinion concluded that an obligation to pay cash promptly did not arise until all five events had occurred. The second sentence, as explained in the July 26 opinion, did not create an additional obligation to pay cash in exchange for Conoco shares before the

shareholder meeting, since the phrase "in exchange for cash" modifies the shares which may be accepted rather than the timing of the payment of cash exchanged for those shares.

While each of these sentences appear clear, an examination of the relationship between the two sentences reveals significant ambiguity regarding DuPont's contractual obligation to pay promptly. By linking the two sentences with the phrase "[n]otwithstanding clause (iii) above," the prospectus is open to the interpretation that DuPont's exercise of its right to accept stock prior to the stockholders' meeting on August 17, also made the date of the stockholders' meeting irrelevant for purposes of triggering its prompt payment obligation.

Two supportable interpretations may be drawn from the "notwithstanding" phrase. While the phrase may be interpreted to refer only to the statement within clause (iii) regarding the requirement of stockholder approval for the proposed merger, the "notwithstanding" phrase may also refer to the function of clause (iii) regarding the requirement of stockholder approval as a prerequisite to DuPont's prompt payment obligation. Of course, there are better ways to express each of the above interpretations than through the cryptic use of the word "notwithstanding." The prospectus could have stated that even if DuPont exercised its right to accept shares in exchange for cash prior to the August 17 meeting that clause (iii) was still valid with regard to its prompt payment obligation. On the other hand, the prospectus could have stated that clause (iii) should be disregarded for prompt payment purposes if DuPont exercised its right to accept shares in exchange for cash. Each interpretation may fairly be drawn from this section as it was written in the body of the prospectus.

Having concluded that the body of the prospectus does not unambiguously set forth the contractual obligations of DuPont, it becomes necessary to examine any possible evidence that would clarify the prompt payment requirement. Some additional evidence may be gathered from the fact that a different version of the "notwithstanding" clause appears in the summary of the prospectus.[1] As stated in the summary, DuPont reserved the right "to accept *and pay for* Conoco shares tendered for cash prior to DuPont stockholder approval" (emphasis added). Caleb urges that the additional words underlined above establish DuPont's absolute duty to pay prior to the stockholder meeting for any Conoco shares accepted in exchange for cash. This interpretation fails for two reasons. First, such an interpretation would mean that this brief phrase establishes a more stringent duty to pay than is set forth at length in the immediately preceding sentence which states DuPont's prompt payment obligation. More importantly, the absolute payment deadline urged by Caleb does not clarify the ambiguity found in the body of the prospectus but instead represents an independent obligation not supported by the body of the prospectus.

Nevertheless, the language in the summary tends to support Caleb's position. The words "and pay for" suggest that the "notwithstanding" clause and sentence which it introduces refer to and modify the prompt payment obligation in the immediately preceding sentence. Therefore, while the words do not create an absolute payment deadline, they do support the argument that the "notwithstanding" clause should be interpreted to make the stockholders' meeting on August 17 irrelevant for the purpose of triggering DuPont's prompt payment obligation.

The most significant evidence for interpreting DuPont's prompt payment obligation as requested by Caleb may be found in the press releases issued by DuPont on

---

1. This evidence only becomes relevant upon the finding that the body of the contract is ambiguous. Had the body of the prospectus been clear, the different language used in the summary would be irrelevant for the purpose of determining DuPont's contractual obligations since the summary section provides that "[t]he information below is qualified in its entirety by the more detailed information ... appearing elsehere in this Prospectus."

August 5, 1981. Since the prospectus itself does not clearly determine the obligations of DuPont, "[t]he practical interpretation of the contract by [the] party, evidenced by his words or acts, can be used against him on behalf of the other party ...." 3 *Corbin on Contracts* § 558, at 256 (1960). *See also Ocean Transport Line, Inc. v. American Philippine Fiber Industries, Inc.*, 743 F.2d 85, 88, 90–91 (2d Cir.1984); *Viacom International, Inc. v. Lorimar Productions, Inc.*, 486 F.Supp. 95, 98 n. 3 (S.D.N.Y.1980).

At 9:12 a.m. on August 5, DuPont issued a press release which included the following statement:

> DuPont has accepted all shares tendered for cash at the close of the withdrawal period last night and began paying $98 for each share at 3:45 a.m. today, in accordance with the terms and conditions of the offer.

> Shares tendered for stock and all shares tendered without election for cash or stock will be exchanged for DuPont shares .... The exchange will take place promptly after August 17, subject to DuPont shareholders' approval of the issuance of DuPont shares.

Very soon thereafter, at 9:55 a.m., the company issued an additional statement:

> Clarifying DuPont's earlier release, all Conoco shares tendered for cash on or prior to midnight Monday, August 3, have been purchased and payment therefor will be made as promptly as practicable.

Together, these statements provide a contemporaneous interpretation by DuPont of its obligations under the prospectus. The first statement depicts DuPont's actions following its acceptance of shares in exchange for cash when it began paying $98 per share immediately on the morning of August 5. The second statement qualified these actions and was termed a clarifica-

tion. It cautioned that payment would only be made as "promptly as practicable," thereby tracking the language in the body of the prospectus. Moreover, the press releases clearly distinguish between the company's prompt payment obligations for the two types of acceptances. Only with regard to those transactions in which Conoco shares were to be exchanged for DuPont shares did the company state that the exchange would take place promptly after August 17, 1981, the date of the stockholders' meeting.

■ The evidence and the practicalities of the tender offer indicate that clause (iii), the August 17 stockholders' meeting, was irrelevant for the purpose of triggering DuPont's prompt payment obligations for Conoco shares accepted in exchange for cash. It is, of course, axiomatic that the language of a contract is to be construed against the draftsman. *67 Wall Street Co. v. Franklin National Bank*, 37 N.Y.2d 245, 371 N.Y.S.2d 915, 918, 333 N.E.2d 184, 186–87 (N.Y.1975). This principle, together with the evidence considered above, compel the conclusion that the July 26 opinion erroneously dismissed Count Two of Caleb's complaint to the extent it was premised on a contractual obligation to pay promptly prior to August 17, 1981.

The conclusion reached today is merely that the August 17 shareholders' meeting was not one of requirements for DuPont's prompt payment obligation towards Caleb. Having rejected the argument that DuPont was absolutely required to pay prior to the shareholders' meeting, no determination has been made regarding the date on which DuPont's payment of cash in exchange for Conoco shares was required under the prospectus.

The prospectus merely requires that DuPont pay "as promptly as practicable" after each of the four conditions, other than the stockholder meeting, had occurred.[2]

---

**2.** It should be noted that DuPont's acceptance of the tendered shares is not listed as one of the preconditions to prompt payment. This can only be regarded as an inadvertent omission since no exchange could possibly have been

contemplated without DuPont's acceptance which would complete the contractual transaction. The prospectus indicates at another paragraph on page 18 that DuPont shall have been deemed to accept validly tendered shares when

At this stage in the proceedings, it is not possible to translate the phrase "as promptly as practicable" into a specific number of days after which DuPont had breached its obligation to pay cash. Caleb's suggested rule of thumb of five days for prompt payment cannot be accepted on the facts now presented. As DuPont correctly notes, the prospectus and letter of transmittal provide that delivery of cash or DuPont shares in exchange for Conoco shares would only be made after Conoco stock certificates had been received by the Exchange Agent; the prospectus permitted tendering shareholders up to eight New York Stock Exchange trading days after tender to deposit their certificates. Thus, the actual date of delivery of the tendered Conoco shares is relevant to determining when payment was required by the prospectus. The time periods specified for other procedures in the tender offer may also be relevant to determining the date on which payment was required under the prospectus. For example, the prospectus cautioned that it would take nine New York Stock Exchange trading days to announce the final results of the first proration.

For the reasons stated above, the July 26 opinion is amended to state that Count Two of Caleb's complaint properly states a claim based on DuPont's contractual obligation to pay "as promptly as practicable" after August 5, 1981. On this date, each of the four required preconditions had been satisfied and DuPont had notified the Exchange Agent of its acceptance.

IT IS SO ORDERED.

it gave oral or written notice to the Exchange    Agent.